**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| PAMELA FRANKLIN, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1:14-CV-176-LY |
| | § | |
| AUSTIN INNER CITY | § | |
| REDEVELOPMENT - PHASE I, LTD., | § | |
| AUSTIN HOUSING FINANCE | § | |
| CORPORATION, CITY OF AUSTIN, | § | |
| AND REGINA COPIC, REAL ESTATE | § | |
| DEVELOPMENT MANAGER FOR THE | § | |
| CITY OF AUSTIN NEIGHBORHOOD | § | |
| HOUSING AND COMMUNITY | § | |
| DEVELOPMENT DEPARTMENT AND | § | |
| AUSTIN HOUSING FINANCE | § | |
| CORPORATION, IN HER INDIVIDUAL | § | |
| CAPACITY, | § | |
| DEFENDANTS. | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiff's Motion for Summary Judgment, filed December 1, 2014 (Clerk's Dkt. No. 18); Defendants' Motion for Summary Judgment, filed December 8, 2014 (Clerk's Dkt. No. 20); Defendants' Response to Plaintiff's Motion for Summary Judgment, filed December 15, 2014 (Clerk's Dkt. No. 22); Plaintiff's Response to Defendants' Motion for Summary Judgment, filed December 22, 2014 (Clerk's Dkt. No. 23); and Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment, filed December 29, 2014 (Clerk's Dkt. No. 24).

The motions were referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b), Rule 72 of the

Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.  After reviewing the parties' pleadings, relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

### I.    BACKGROUND

Plaintiff Pamela Franklin ("Franklin") filed this action on September 25, 2013, naming as defendants Austin Inner City Redevelopment - Phase I, Ltd. ("AICR"), Austin Housing Finance Corporation ("AHFC"), City of Austin ("the City"), and Regina Copic[1] ("Copic"), the Real Estate Development Manager for the City's Neighborhood Housing and Community Development Department and AHFC, in her individual capacity (collectively, "Defendants").[2] The basis of this lawsuit is straightforward.  Franklin contends she has a right to purchase the home in which she lives as a lessee ("the Residence") pursuant to a valid contract with Defendants, entered into in 1998.  Defendants counter that the contract was never executed and therefore no purchase option was ever granted.

Franklin moves for summary judgment under 21 U.S.C. § 1983, requesting declaratory judgment that Defendants' refusal to honor the contract is a violation of her due process rights and an order requiring Defendants to specifically perform under the contract.[3]  Defendants also

---

[1] Franklin has advised the Court that she no longer wishes to pursue claims against Copic in her individual capacity. (Clerk's Dkt. No. 18 at 2).

[2] Franklin originally filed this action in the 126th Judicial District Court of Travis County, Texas on September 25, 2013.  (Clerk's Dkt. No. 1 at 7).  She filed an amended complaint on January 28, 2014.  (Clerk's Dkt. No. 1 at 56). The case was removed to the United States District Court for the Western District of Texas, Austin Division on February 27, 2014.

[3] In the first amended complaint, Franklin requests an award of actual damages, declaratory relief, specific performance, attorney's fees, litigation costs, court costs, and post-judgment interest at the legal rate.  (1st Am. Compl. ¶ 31).  Franklin's summary judgment motion requests declaratory judgment that Defendants violated her due process rights and an order requiring Defendants to comply with the terms of the contract.  Accordingly, the undersigned will address only the relief requested in the motion for summary judgment.

move for summary judgment, seeking dismissal of all Plaintiffs' claims.   The motions for summary judgment are now ripe for consideration.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a).   A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).   The Court will view the summary judgment evidence in the light most favorable to the non-movant.   *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact."   *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 484 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial.   *Celotex*, 477 U.S. at 323; *Celtic Marine Corp. v. James C. Justice Co., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).   The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.   *Celtic Marine*, 760 F.3d at 481 (citing *Celotex*, 477 U.S. at 325).   Once the non-movant has been given the opportunity to present evidence to create a genuine issue of fact, the court will grant summary judgment if no reasonable juror could find for the non-movant.   *Boos v. AT&T, Inc.*, 643 F.3d 127, 130 (5th Cir. 2011).

### III.   SUMMARY JUDGMENT EVIDENCE

The following facts are undisputed by the parties.[4]  In 1990, AHFC[5] began acquiring properties in the Blackshear neighborhood in East Austin for the development of an affordable housing single-family subdivision.  The City named the program the Scattered Cooperative Infill Program ("SCIP I Program").  The SCIP I Program was instituted to provide home ownership opportunities to low-income families.  (Pltf. Ex. 1).  AHFC and the City contributed funding to develop the properties into forty-four lots in a subdivision named Heritage Heights.  In 1992, AHFC conveyed the subdivision lots to AICR.  AICR is a non-profit organization established by AHFC for the ownership of the rental properties in Heritage Heights.  (Copic Depo. 14:11–21).

The City originally designed the SCIP I Program with the intent that the families would receive Section 8 certificates that would subsidize the rents up to the fair market rent, thus ensuring payment of the construction costs on the homes over a fifteen-year period.  (Pltf. Ex. 4

---

[4] Plaintiff frequently references Plaintiff's Exhibit 1, a compilation of the facts alleged in Plaintiff's complaint which Defendants admitted in their answer.  Plaintiff's Exhibit 1 includes two documents whose authenticity has also been admitted by Defendants: an April 9, 1998 letter from Paul Hilgers from the Office of Corporate Counsel for AHFC to "All Current Tenants in Heritage Heights" (Pltf. Ex. 1 at 10–11), and a copy of the 1998 Addendum to the Residential Lease Agreement, signed by Wiley Hopkins, an authorized representative of AICR (Pltf. Ex. 1 at 13–15).  These two documents are competent summary judgment evidence.  *See Celtic Marine*, 760 F.3d at 481.

The remainder of Plaintiff's Exhibit 1 is essentially a restatement of the pleadings.  Pleadings, even if sworn or verified, are generally not competent summary judgment evidence.  *Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 203 n.1 (Tex. Ct. App.—Houston [14th Dist.] 2006, no pet.) (citing *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660–61 (Tex. 1995)) (appellee improperly relied on appellant's third amended original petition as summary judgment evidence).  However, as in *Jankowiak*, the undersigned will treat the fact issues set out in Plaintiff's Exhibit 1 as undisputed for the purpose of this opinion, as Defendants do not object to Plaintiff's Exhibit 1.  Further, the parties in their respective motions for summary judgment assert there is no genuine issue of material fact and they are "contest[ing] a purely legal issue," i.e., whether a contract was formed, thus conveying property rights upon Franklin.  *Id.*; *see Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 207 (5th Cir. 1998) (whether offer was accepted and contract was formed is primarily question of law for the court to decide).  *See also In re Pearson*, 394 B.R. 133, 141 (Bankr. S.D. Tex. 2008) ("[W]hether written agreement is ambiguous is question of law which must be decided by examining the contract as a whole in light of the circumstances at the time the contract was formed."); *Parviz-Khyavi v. Alcon Laboratories, Inc.*, 395 S.W.3d 376, 379 (Tex. App.—Dallas 2013, no pet.) (whether unilateral contract was formed is question of law).  *See also Gaala v. Citizens Med. Ctr.*, 407 F. App'x 810, 814 (5th Cir. 2011) ("Whether a governmental action passes rational basis muster is a question of law.").  Unless otherwise noted, the undisputed facts described above are taken from Plaintiff's Exhibit 1.

[5] AHFC is the City's non-profit housing corporation.  (Copic Depo. 14:4–10).

at 42–43).  At the end of fifteen years, any family completing fifteen years of continuous tenancy would receive title to the property for $1.00.  *Id.*

Before any homes had been built or leased, the City determined it would be unable to obtain the Section 8 certificates, and so it deleted the provision providing for sale of the homes for $1.00 to any family successfully completing a fifteen-year tenancy.  *Id.*  The City proceeded, however, to lease the SCIP I homes to eligible low-income families with the express written representation that the homes would be "available for rent with eventual ownership opportunity. The prospective buyer must rent the house for 15 years at which time he/she may be eligible to buy the house."  (Pltf. Ex. 4 at 36).  Franklin qualified for the lease program financially.  She signed a lease agreement and moved into her home in the Heritage Heights on August 28, 1993, where she continues to reside today.

In 1998, Defendants responded to complaints about "reneging" on the ownership opportunity promised to SCIP I Program tenants by expressly agreeing that all of the original tenants would be given a right of first refusal to purchase their home at a reasonable price, conditioned on the tenant's successful completion of at least fifteen years of tenancy.  (Pltf. Ex. 5 at 34–35).  On April 9, 1998, Paul Hilgers ("Hilgers"), the director of the City's Housing Department at that time, sent a letter to all original tenants residing in the SCIP I development, including Franklin, informing them as follows:

> Our legal department is preparing a separate first right or [sic] refusal option for delivery to all tenants who have leased their home from the beginning. This will allow all original tenants who remain in the property for 15 years to purchase the home at a price to be determined at the end of the 15 year period. You can be assured that no one leasing a SCIP [I] rental will be denied a homeownership opportunity at a reasonable price at the end of the 15 year period.

(Pltf. Ex. 1 at 11).

Defendants subsequently held a tenant meeting for Heritage Heights community, at which they delivered to each original tenant in SCIP I, including Plaintiff Franklin, a lease addendum, signed by an authorized representative of AICR, titled "ADDENDUM TO RESIDENTIAL LEASE AGREEMENT—Right of First Refusal to Purchase Current Residence" ("Lease Addendum").  (Pltf. Ex. 1 at 13–15 "Lease Addendum").

The Lease Addendum provides:

**Right of First Refusal to Purchase Current Residence:**

On or after termination of the Compliance Period,[6] but no later than 180 calendar days following termination of the Compliance Period, Owner[7] shall provide Tenant the Escrow Contract offering to sell the Current Residence to Tenant. Following receipt of the Escrow Contract, Tenant shall have the right to first refuse to purchase the Current Residence from Owner in accordance with the Escrow Contract, provided:

1. Tenant continuously occupies the Current Residence until the end of the Compliance Period; and
2. There remains no uncured event of default with respect to any provision in the Residential Lease or any subsequent residential lease(s) entered into between Tenant and Landlord with respect to the Current Residence during the Compliance Period; and
3. Tenant executes and delivers to the Escrow Agent the Escrow Contract and an earnest money check in the amount of $500 payable to the Escrow Agent; and
4. The Escrow Agent receives the Escrow Contract from Tenant no later than twenty calendar days following Tenant's receipt of the Escrow Contract; and
5. At least thirty calendar days prior to the closing, the Tenant secures, in writing, the necessary financing to pay for the portion of the Purchase Price not payable in cash; and
6. The closing, unless extended by Owner for an additional term, occurs on or before 150 calendar days following the Tenant's receipt of the Escrow Contract; and
7. The sale of the Current Residence to Tenant is subject to Tenant securing a release of any lien(s) on the Current Residence at the time of purchase; and
8. The sale of the Current Residence to Tenant fully complies with all requirements of the federal Low Income Housing Tax Credit Program (codified in the federal regulations governing the program at 26 CFR part 42)

---

[6]  The "Compliance Period" is defined in the Lease Addendum as beginning on the first date of tenancy and ending on March 31, 2009.  (Lease Addendum at 1).
[7]  "Owner" is defined in the Lease Addendum as AICR.  (*Id.*).

and no recapture of the credit occurs as a result of the sale of the Current Residence to Tenant.

**General Requirements:**

In the event Tenant fails to exercise its right of first refusal as set forth in this Addendum, Owner shall authorize Escrow Agent to return the Earnest Money to Tenant and the Escrow Contract and this Addendum shall become null and void and of no further force or effect. This Addendum is not assignable and is not transferable by Tenant. By this reference this Addendum is incorporated into all subsequent residential lease agreements entered into between Landlord and Tenant with respect to the Current Residence during the Compliance Period.

(Lease Addendum at 2–3).

The only fact disputed by the parties is whether Franklin signed and returned the Lease Addendum. Franklin testifies in her sworn declaration that she attended the meeting with the City for SCIP I tenants at Holy Cross Church in 1998, at which the City distributed the Lease Addendum. (Pltf. Ex. 6 "Franklin Decl." ¶ 2). Franklin's brother, Larry Franklin, the Vice President for the Residents' Council for the SCIP I development at the time of this meeting, corroborates Ms. Franklin's testimony that "[t]he City Staff distributed the Lease Addendum Right of First Refusal to the tenants who were present" at the meeting. (Pltf. Ex. 7 "L. Franklin Declaration" ¶¶ 1–2). Ms. Franklin contends she signed the Lease Addendum and returned it to the City at the meeting. (Franklin Decl. ¶¶ 3–4). Mr. Franklin states that he saw his sister sign and return the Lease Addendum. (L. Franklin Decl. ¶ 3).

The City maintains it does not have any signed Lease Addendum from Franklin or any other original tenant present at the meeting. (Pltf. Ex. 5 "Potter Depo." 17:24–18:1). In fact, the City admits it does not have any records of tenant files from 1998, the year in which Franklin purportedly signed and delivered the Lease Addendum at the tenant meeting, because these

tenant files were maintained by property management companies in 1998, 1999, 2000, and 2001 and not retained by the City thereafter.[8]  (Potter Depo 18:18–21, 20:21–21:4).[9]

After the 1998 meeting at Holy Cross Church, Franklin continued to reside in the Residence and comply with her lease.  The Compliance Period ended on March 31, 2009.  (Lease Addendum at 1).  However, an AICR representative never provided Franklin with an Escrow Contract.  In April 2013, Franklin, through counsel, contacted Defendants and asked that they comply with the right of first refusal to purchase the Residence per the Lease Addendum and the SCIP I Program.  Copic responded on April 30, 2013, and denied that Franklin has a contractual right of first refusal to purchase the Residence.  (Def. Ex. C-4 at 1–2).

In subsequent email correspondence on August 29, 2013, Copic, reiterated that Plaintiff did not have a contractual right of first refusal to purchase the property at a reasonable price.  (*Id.* at 3–5).  On September 25, 2013, Plaintiff sent a letter to all Defendants requesting compliance with her purported right of first refusal.  None of the Defendants replied.  (Pltf. Ex. 1 ¶ 19).

## IV.   ANALYSIS

Franklin contends the Lease Addendum is a valid contract with Defendants that entitles her to elect to purchase the Residence, where she has lived since 1993.  According to Franklin, Defendants violated her constitutional procedural and substantive due process rights by arbitrarily and capriciously revoking her fully vested property right without notice and opportunity to be heard.  Defendants counter that Franklin never accepted the offer to enter into a contract, therefore no constitutionally protected property right had vested, and no deprivation of due process occurred.

---

[8] The City has never managed the SCIP I properties, and instead contracted with management companies to manage the SCIP I properties.  (Potter Depo 18:22–19:2).

[9] Franklin contends that she did save a copy of the Lease Addendum in her car's glove box, but it was never recovered following a car accident.  (Franklin Decl. ¶ 4).

### A.      Did a Constitutionally Protected Property Right Vest?

The Fourteenth Amendment forbids government conduct that deprives "any person of life, liberty, or property without due process of law.  U.S. CONST., amend. IV.  "To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Morris v. Livingston*, 739 F.3d 740, 749–50 (5th Cir. 2014) (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010)).  In cases involving contracts between individuals and the government, the Fifth Circuit has distinguished between breach of contract claims and claims that the state deprived the plaintiff of property without due process of law. *See Braden v. Tex. A&M Univ. Sys.,* 636 F.2d 90, 93 (5th Cir. 1981).  While due process "does not make a federal case out of every breach of contract by a state agency," a plaintiff may bring "claims for deprivation of property without due process even though the property interest is alleged to be founded on a contract." *Id.*  The Supreme Court has made clear that property interests protected by the constitution "extend well beyond actual ownership of real estate, chattels, or money." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571–72 (1972).

#### 1.      Type of Contract

As a preliminary matter, it appears the parties and counsel confuse a right of first refusal with an option to purchase.  A traditional right of first refusal conveys to a grantee the right to purchase a property only when the seller decides to sell the residence.  *Hicks v. Castille*, 313 S.W.3d 874, 880–81 (Tex. App.—Amarillo 2010, pet. denied) (describing right of first refusal as a "dormant option"); *City of Brownsville v. Golden Spread Elec. Coop., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied) (right of first refusal matures into enforceable option when property owner gives notice of intent to sell).  "Unlike an option contract, a right of first

refusal does not give the lessee the power to compel an unwilling owner to sell." *Comeaux v. Suderman*, 93 S.W.3d 215, 219 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (citing *Riley v. Campeau Homes (Tex.), Inc.*, 808 S.W.2d 184, 187 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agmt.)).   An option to purchase is a contract granting "the right to compel the sale of a property on the stated terms before the expiration of the option." *Id.* at 219–20.   An option to purchase has two components: (1) an underlying contract that becomes binding upon acceptance; and (2) a covenant to hold open to the optionee the opportunity to accept. *Id.* at 220.   Under an executory option contract, the buyer has a right, but no obligation, to complete the purchase of the property. *Bryant v. Cady*, 445 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, reh'g overruled) (citing *Gaona v. Gonzales*, 997 S.W.2d 784, 786–87 (Tex. App.—Austin 1999, no pet.)).   An option to purchase real property that is combined with a residential lease agreement "is considered an executory contract for conveyance of real property." *Lugo v. Ross*, 378 S.W.3d 620, 623 (Tex. App.—Dallas 2012, no pet.).

The Lease Addendum states, "[N]o later than 180 calendar days following termination of the Compliance Period, owner shall provide the Tenant the Escrow Contract *offering to sell* the Current Residence." (Lease Addendum at 2).   The Lease Addendum grants the tenant the right to purchase the residence and close the sale "on or before 150 calendar days following the Tenant's receipt of the Escrow Contract."   (*Id.*).   This is the set time period within which Franklin has the right to purchase the Residence.[10]   The Lease Addendum further defines the purchase price as "[t]he amount established by Owner on or before 180 calendar days following termination of the Compliance Period which is at least equal to the Minimum Purchase Price." (*Id.* at 1).   The Minimum Purchase Price is "[a]n amount which is at least equal to the sum of (a)

---

[10] It appears the option period began on March 31, 2009, the end of the Compliance Period. AICR had 180 days to perform, and Franklin thereafter had 150 days total to perform, resulting in a closing on February 24, 2010 at the latest.

the principal amount of outstanding indebtedness secured by the Current Residence (other than indebtedness incurred within the 5-year period ending on the date of the sale of the Current Residence to Tenant) and (b) all federal, state and local taxes attributable to such sale." (*Id.*). Accordingly, rather than a right of first refusal, the Lease Addendum conveys the option to purchase during a specific time period upon the occurrence of specific events. *See Overton v. Bengel*, 139 S.W.3d 754, 757 (Tex. App.—Texarkana 2004, no pet.) (document entitled "First Right of Refusal" was nevertheless option to purchase where optionee could purchase within set time period). The Lease Addendum will hereinafter be characterized as an option to purchase, rather than a right of first refusal.

### 2. *Valid Option to Purchase and Exercise of Option*

Defendants contend the Lease Addendum was an offer to enter into a contract, which was never clearly and definitely accepted, and thus lapsed after a reasonable time, while Franklin contends the Lease Addendum was a contract that was effective upon delivery. Therefore, the undersigned must determine whether the Lease Addendum was a valid option to purchase, and if so, whether the option was subsequently exercised.

### i. Was a Contract Formed?

Defendants assert Franklin never signed the Lease Addendum, therefore she never accepted the Lease Addendum. Under Texas law, the absence of a signature on a contract does not necessarily destroy its validity. *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 648 (Bankr. S.D. Tex. 2010) (citing *Simmons & Simmons Constr. Co. v. Rea,* 286 S.W.2d 415, 418 (Tex. 1955); and *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 292 (Tex. App.—Corpus Christi 2003, pet. denied)). This is especially true where one party signs the contract, and the other party acts to accept the contract. *DeClaire v. G & B Mcintosh*

11

*Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also Endeavour Highrise*, 432 B.R. at 648 (contracts may be accepted through acts, performance, or other unconditional actions of acceptance). When a contract lacks one party's signature, other evidence may be relied on to prove the parties' intentions. *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 455–56 (5th Cir. 2013).

Normally, whether an agreement was required to be signed to become valid is an issue of the parties' intent, and thus a question of fact for the jury to decide. *Tricon Energy*, 718 F.3d at 454 (quotation omitted). However, "[w]hatever the usual approach, there is nothing wrong, *per se*, with a court's deciding intent as a matter of law." *Id.* Hence, whether the parties intended to be bound by a contract may be determined as a matter of law. *Id.* (quoting *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2010, pet. denied)). *See also Scaife v. Assoc. Air Center, Inc.*, 100 F.3d 406, 410 (5th Cir. 1996) ("[T]he question of whether an offer was accepted . . . is primarily a question of law for the court to decide.").

To determine whether the parties intended to be bound by the Lease Addendum without Franklin's signature or delivery, the undersigned first turns to the Lease Addendum itself. Nowhere in the Lease Addendum is it stated that Franklin was required to sign in order for her option to purchase to become valid. Similarly, nowhere in the Lease Addendum is it stated that Franklin must deliver the signed Lease Addendum to an Escrow Agent or any of the Defendants. There are no listed deadlines for signature or delivery of the Lease Addendum. Rather, the Lease Addendum specifically stated it was "[b]y [] reference incorporated into all subsequent residential lease agreements entered into between Landlord and Tenant with respect to the Current Residence during the Compliance Period." (Lease Addendum at 3). Although

Defendants argue that this provision was intended to require overt acceptance of the Lease Addendum for it to become incorporated into the residential lease, the undersigned declines to give credence to "the intention which the parties may have had but failed to express in the instrument . . . ." *Moore v. Dodge,* 603 S.W.2d 236, 238 (Tex. Civ. App.—El Paso 1980, writ ref'd n.r.e.).  What controls is "the intention which, by said instrument, they *did* express." *Id.* (emphasis added). Moreover, contracts will generally be construed against the drafter—here, Defendants. *Republic Nat'l Bank of Dall. v. Nw. Nat'l Bank of Fort Worth*, 578 S.W.2d 109, 115 (Tex. 1978). Considering the plain language of the Lease Addendum and construing any deficiencies against Defendants, it appears on the face of the Lease Addendum that a signature or delivery was not required for acceptance.

Further supporting the notion that Defendants intended to be bound by the Lease Addendum without Franklin's signature is that Wiley Hopkins ("Hopkins"), an authorized representative of AICR's general partner, signed the Lease Addendum.  Defendants argue the existence of a signature line next to Hopkins' with the word "Tenant" underneath demonstrates that Franklin's signature was also required to render the Lease Addendum a binding contract. However, "blank signature lines are not proof, by themselves, that the parties required formal signatures for a contract to be binding." *Ehnot v. Labarge Coating, LLC*, 2013 WL 4829260, at *9 (S.D. Tex. Sept. 10, 2013) (quoting *Tricon Energy*, 718 F.3d at 454).  Accordingly, the Lease Addendum itself does not indicate Franklin's signature or delivery was required to bind the parties.

The undersigned next considers evidence of "the full context of the parties' negotiations" to determine whether the parties intended for the Lease Addendum to become binding without formal acceptance. *Tricon Energy*, 718 F.3d at 455–56 (analyzing parties' interactions prior to

and after forming contract to determine if formal execution of contract was required); *see also City of Hous. v. Williams*, 353 S.W.3d 128, 137 (Tex. 2011) ("It is well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent."). Tellingly, Defendants made several unequivocal promises to the SCIP I tenants, including Franklin, that tenants would have the opportunity to purchase the residence in which they reside. On February 25, 1998, Hilgers, the Community Development Officer of the Neighborhood Housing and Community Development Offices, wrote a letter to the City's mayor and city council ("City Letter"). (Pltf. Ex. 4 at 34–35). In the City Letter, Hilgers addressed recent scrutiny that the City may be reneging on promises to SCIP I Residents regarding their homes. He assured the City's mayor and city council that the City had not reneged on its promises. Hilgers recounted that at a meeting on September 21, 1994 at the Holy Cross Church, City staff and a facilitator "again advised [renters] that they would be given the opportunity to purchase the home at the end of the 15-year period at a price to be determined at that time." (*Id.* at 35). Attached to the City Letter was a memorandum to the SCIP tenants dated October 24, 1993 (revised) that summarized the SCIP program ("SCIP Memo"). (*Id.* at 36). The SCIP Memo stated, "The [SCIP] program will provide . . . eventual homeownership opportunities for another 75 very low income families." (*Id.*). The memorandum specified that "[t]he prospective buyer must rent the home for 15 years at which time he/she may be eligible to buy the home." (*Id.* at 37). The SCIP Memo then lists several requirements regarding renter family size, income, commitment to becoming a permanent resident of the neighborhood, employment history, debt judgments, financial obligations, behavior, and criminal history.[11] (*Id.*).

Also attached to the City Letter is a letter from Hilgers to the SCIP I tenants ("Tenant Letter I"), dated February 24, 1998. (Pltf. Ex. 4 at 38–39). In Tenant Letter I, Hilgers explains

---

[11] The parties do not dispute that Franklin meets all of the requirements listed in the SCIP Memo.

the original plan for the SCIP program had been changed, but that it was changed prior to the

SCIP I homes being built and before any SCIP I tenants signed a lease.  He clarified that the

Neighborhood Housing and Community Development Offices "are asking our legal department

to explore the possibility of developing a separate option agreement . . . [which] would provide

written assurances that any tenant who had rented the property for 15 years would have the first

option of purchasing the home at a price to be determined then."   (*Id.* at 39).  On April 9, 1998,

Hilgers sent another letter to the SCIP I tenants ("Tenant Letter II").  (Pltf. Ex. 4 at 42–43).  The

letter stated:

> Our legal department is preparing a separate first right [of] refusal option for
> delivery to all tenants who have leased their home from the beginning. This will
> allow all original tenants who remain in the property for 15 years to purchase the
> home at a price to be determined at the end of the 15 year period. You can be
> assured that no one leasing a SCIP [I] rental will be denied a homeownership
> opportunity at a reasonable price at the end of the 15 year period.

(*Id.* at 43).  Thereafter, the Lease Addendum, signed by Hopkins, was given to the SCIP I tenants

at the organizational meeting.

In light of the above evidence, there is overwhelming evidence that Defendants intended

to be bound by the Lease Addendum's option to purchase.  Defendants made representations to

the City and the SCIP I tenants that the purpose of the SCIP I Program was to allow low-income

families to purchase houses in order to "develop[] a clean and habitable neighborhood in East

Austin." (*Id.*).  Moreover, Defendants assured "*no one* leasing a SCIP I rental will be denied a

homeownership opportunity." (*Id.*).  There is simply no evidence that a signature and delivery

were required to make the Lease Addendum option to purchase valid.   *See Tricon Energy*, 718

F.3d 455 (upholding unsigned arbitration contract where no evidence that parties intended to

require signatures for contract to become binding; blank signature lines were insufficient to raise

genuine issue of material fact).  *See also Sinclair Refining Co. v. Allbritton*, 218 S.W.2d 185, 188

(Tex. 1949) (purchase option is largely for the benefit of optionee).   Accordingly, the undersigned finds as a matter of law that the parties did not intend for Franklin's signature to be required for the Lease Addendum to be valid.[12]

The Lease Addendum was therefore effective upon delivery to Franklin and is a valid option to purchase.[13]   The undersigned must next determine whether Franklin exercised her option, thus conveying upon her a vested property right.

### ii.    Did Franklin Exercise the Option?

Defendants argue Franklin's property rights under the option did not vest because she has not signed or returned the Escrow Contract, or tendered the $500 check within the specified time frame. A valid option to purchase real property is unilateral in nature. *Colligan v. Smith*, 366 S.W.2d 816, 820 (Tex. App.—Fort Worth 1963, writ ref'd).  "An option passes no title but is an executory contract prescribing conditions upon the occurrence of which an optionee may become entitled to demand passage of title." *Lusher v. First Nat'l Bank of Fort Worth*, 260 S.W.2d 621, 626 (Tex. App.—Forth Worth 1953, writ ref. n.r.e.).  If an option to purchase specifies a method of notification of exercise of the option, an optionee must exercise the option according to its terms.  *Comeaux*, 93 S.W.3d at 220.  Untimely or defective acceptance "is simply ineffectual, and legally amounts to nothing more than a rejection."  *Id.* (citing *Crown Constr. Co., Inc. v. Huddleston*, 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no pet.)).  However, "[a]n optionor may 'not commit any act or omit to perform any duty' that would cause the optionee not to exercise the option." *Id.* (quoting *Colligan*, 366 S.W.2d at 820).  "An optionor fails to

---

[12] Even if a signature was required to create an enforceable option to purchase, Franklin's sworn declaration is competent summary judgment evidence that she provided Defendants with a signed Lease Addendum.  Defendants, however, merely offer that they do not have tenant records from the year Franklin contends she delivered the signed Lease Addendum.

[13] *See also* TEX. BUS. & COM. CODE. § 26.01(a), (b)(5) (statute of frauds is satisfied where lease modifications are in writing and signed by the party against whom modification is to be enforced); *Lawrence v. Reyna Realty Group*, 434 S.W.3d 667, 673 (Tex. App.—Houston [1st Dist.] 2014, no pet. h.) (same).

perform her obligations under a contract if her actions prevent the completion of a sale." *Elliot v. Lewis*, 1994 WL 709333, at *5 (Tex. App.—Dallas Dec. 16, 1994, no pet.) (citing *Odum v. Sims*, 609 S.W.2d 881, 882 (Tex. Civ. App.—San Antonio 1980, no writ)).

The Lease Addendum conveying the option to purchase did not include any provision requiring Franklin to notify Defendants that she intended to exercise the option. Although options to purchase generally require the optionee to issue express notice, the plain language of the Lease Agreement unequivocally put the burden on Defendants: "On or after termination of the Compliance Period, but no later than 180 calendar days following termination of the Compliance Period, *Owner shall provide Tenant the Escrow Contract offering to sell* the Current Residence to Tenant." (Lease Addendum at 2). *See, e.g., Bryant*, 445 S.W.3d at 822 ("By the unambiguous terms of the agreement, as long as the Appellants live on the property for the ten years of the lease and make timely rental payments, Cady is obligated to sell them the property . . . . but only the Appellants have the option to decline the purchase."). The only conditions precedent to AICR's obligation to deliver the Escrow Contract offering the sale were: (1) "Tenant continuously occupies the Current Residence until the end of the Compliance Period;" and (2) "There remains no uncured event of default with respect to any provision in the Residential Lease or any subsequent residential lease(s) entered into between Tenant and Landlord with respect to the Current Residence During the Compliance Period . . . ."[14]

It is undisputed that Franklin complied with every term of the contract she was able to perform without assistance from Defendants: she continuously occupied the Residence until the end of the Compliance Period on March 31, 2009, and there is no uncured event of default with respect to any of the numerous provisions in her lease. Only after receipt of the Escrow Contract

---

[14] The parties also contend that living in the residence for fifteen years was a condition precedent to the option to purchase. Although the fifteen-year requirement is mentioned in the SCIP Memo and Tenant Letters, it was not mentioned in the Lease Addendum.

offering sale of the residence would Franklin have been able to execute and deliver the Escrow Contract and a check for $500 to the Escrow Agent, secure in writing the necessary financing to pay for the portion of the Purchase Price within 30 days of closing, and close the sale within 150 days following receipt of the Escrow Contract.

AICR nevertheless failed to deliver the Escrow Contract to Franklin within 180 days of expiration of the Compliance Period, and to date has not delivered the Escrow Contract. It was not Franklin's duty to request the Escrow Contract in 2009, nor was it her duty to remind Defendants to comply with the contract they themselves drafted. *See Super-Cold Sw. Co. v. First Baptist Church of Corsicana,* 219 S.W.2d 569, 573 (Tex. Civ. App.—Waco 1949, writ ref'd n.r.e.) (parties to contract are required to carry out all terms of contract in good faith). By no fault of her own, Franklin was therefore unable to exercise the option to purchase. *See US MCT, Inc. v. Brodsky*, 2001 WL 1360301, at *4 (Tex. App.—Dallas Nov. 7, 2001, no pet.) ("The failure of a party to comply strictly with the terms and conditions of an option agreement will be excused when such failure is brought about by the conduct of the other party." (citing *Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 717 (Tex. App.—Houston [14th Dist.] 1996, writ dism'd); and *Colligan*, 366 S.W.2d at 820)). Defendants' attempt to blame Franklin for Defendants' failure to comply with the terms of the Lease Addendum is not well taken. *See FDIC v. Am. Home. Assur. Co.*, 585 S.W.2d 756, 759 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) ("It is well established that an option[o]r may not commit any act or omit to perform any duty which is calculated to impede, delay, or otherwise frustrate the exercise of the option."); *Tiffany Dev. Corp. v. Cangelosi*, 514 S.W.2d 321, 325 (Tex. App.—Houston [1st Dist.] 1979, no pet.) (same). Franklin has complied with the conditions precedent to Defendants' delivery of the Escrow Contract in good faith, but her attempt to exercise the option to purchase

was frustrated by AICR's non-compliance with the terms of the Lease Addendum.  Therefore, the undersigned finds Plaintiff exercised the option in April 2013, when she contacted Defendants through counsel and asked that they comply with the option to purchase the Residence per the Lease Addendum and the SCIP I Program.

### 3. *Is the Option to Purchase a Protected Property Right?*

Because the Fifth Circuit has clearly differentiated between mere contractual rights, and constitutionally protected property rights, the undersigned must determine whether Franklin's exercised option to purchase is constitutionally protected property.  "[T]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except for cause." *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 250 (5th Cir. 2000) (quoting *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998)).  In Texas, an option contract is a "privilege or right which the owner of property gives another to buy certain property at a fixed price within a certain time."  *Casa El Sol-Acapulco*, 919 S.W.2d at 717 n.9 (quoting *Texas v. Clevenger*, 384 S.W.2d 207, 210 (Tex. Civ. App.—Houston 1964, writ ref'd n.r.e.)). *See also Best Bldg. Co. v. Sikes*, 394 S.W.2d 57, 61—62 (Tex. App.—Fort Worth 1965, writ ref'd n.r.e.) (option to purchase is property right).  An option to purchase, upon exercise, is binding upon the parties. *Riley*, 808 S.W.2d at 188.  *See also FDIC*, 585 S.W.2d at 759 (optionor cannot frustrate exercise of option).  Therefore, Franklin's exercised option to purchase "cannot be removed except for cause," and is a constitutionally protected property interest. *Simi Inv. Co.*, 236 F.3d at 250.  Accordingly, the undersigned must determine whether Franklin was afforded procedural and substantive due process of law.

**B.      Did Defendants Deprive Franklin of her Property Right without Due Process?**

Having found Franklin was deprived of a constitutionally protected property right, the undersigned turns to the requirements of establishing a procedural due process and a substantive due process claim.   Summarized, "[p]rocedural due process considers not the justice of a deprivation, but only the means by which the deprivation was effected."   *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 222 (5th Cir. 2012) (quoting *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991)).   Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *McClendon v. City of Columbia*, 305 F.3d 314, 335 (5th Cir. 2002) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

*1.      Procedural Due Process*

The Due Process Clause encompasses the protection of a guarantee of fair procedure. The Supreme Court has consistently held "some form of hearing is required before an individual is finally deprived of a property interest."   *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).   *See also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property."); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property").

Therefore, the Court must weigh the following to determine what process is due:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail.

*Bowlby*, 681 F.3d at 221 (quoting *Mathews*, 424 U.S. at 335).   The Supreme Court has "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (emphasis in original) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)).

According to the undisputed facts, Franklin's attorney inquired regarding the option to purchase in April 2013.  Copic, on behalf of AHIC, simply notified Franklin's attorney via email that Franklin had no property rights and refused to perform under the Lease Addendum.  This amounts to no process at all, which increases the risk of an erroneous deprivation.  *See Matthews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))); *Bowlby*, 681 F.3d at 221 (revocation of permits without any process increases risk of erroneous deprivation).

Franklin has a private interest in purchasing her home.  *See Krimstock v. Kelly*, 306 F.3d 40, 61 (2d Cir. 2002) ("The deprivation of real or personal property involves substantial due process interests" (citing *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53–54 (1993))).  *See also James Daniel Good Real Prop.*, 510 U.S. at 53–54 ("[R]ight to maintain control over [one's] home and to be free from governmental interference, is a private interest of historic and continuing importance"). She relied upon Defendants' representations that she would be entitled to purchase her home, and specifically testified that she moved to East Austin and participated in the SCIP I rental program in reliance on Defendants' promises.  (Franklin

Depo. 14:11–21).  Franklin's interest in her home supports her claim that her due process rights were violated.

Defendants maintain the government has an interest in requiring actual evidence that Franklin accepted the Lease Addendum's offer of the option to purchase.  Even if this is true, the fiscal and administrative burdens of conducting at least an informal hearing before the City are far outweighed by the burdens on Franklin if she is deprived of her property right without an opportunity to contest the deprivation.  *See Bowlby*, 681 F.3d at 221 ("*Matthews* balancing test 'permits varied types of hearings, from informal to more formal evidentiary hearings." (quoting *Ecee, Inc. v. FERC*, 645 F.2d 339, 352 (5th Cir. 1981))); *see also Eguia v. Tompkins*, 756 F.2d 1130, 1139 (5th Cir. 1985) (although there are "extraordinary situations" warranting postponement of opportunity to be heard until after deprivation of property interest, due process typically requires pre-deprivation hearing).

Accordingly, the undersigned finds Defendants' email in response to Franklin's request for the Escrow Contract, which denied Franklin's option to purchase without notice or a hearing, was a deprivation of Franklin's procedural due process rights under the United States Constitution.  Summary judgment on this claim should therefore be granted in favor of Franklin.

2.     *Substantive Due Process*

To succeed on a substantive due process claim, a plaintiff must cross two hurdles.  First, she must prove a deprivation of a constitutionally protected right.  *Mikeska v. City of Galveston*, 451 F.3d 376, 379 (5th Cir. 2006); *Simi Inv. Co.*, 236 F.3d at 249.  As stated above, Franklin has proven the deprivation of her constitutionally protected property right.

The second prong of the substantive due process test is whether the governmental action was "rationally related to a legitimate governmental interest."  *Mikeska*, 451 F.3d at 379; *FM*

*Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996). Again, Defendants maintain they have a legitimate governmental interest in denying Franklin's request to purchase the property where there is no actual evidence that Franklin accepted the Lease Addendum offer, i.e., no contract signed by Franklin. In support of this contention, Defendants point out that if Defendants were to agree to sell the property to Franklin, the other SCIP I tenants could claim they were entitled to an option to purchase without any documentation.[15] Defendants further contend that keeping the property in affordable housing developments for rental purposes, unless there is a valid acceptance of the option to purchase, is a legitimate governmental interest.

The rational basis review bar is low: "The question is only whether a rational relationship exists between the [policy] and a *conceivable* legitimate governmental objective." *FM Props.*, 93 F.3d at 174–75 (quoting *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 246 (1st Cir. 1990)). If this question is debatable, there is no substantive due process violation. *Id.* (citing *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926)). In fact, even a colorable, but incorrect interpretation of a law, rule, or contract may pass rational basis review. *See FM Props.*, 93 F.3d at 174 (city council's purportedly incorrect interpretation of bill or other violations of state law are insufficient to state constitutional claim under Fourteenth Amendment). However, "[w]hile the 'rational basis' standard is the least demanding test used by the courts to uphold [governmental] action, it is not 'toothless.'" *Simi Inv. Co.*, 236 F.3d at 253 (quoting *Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998)).

---

[15] Franklin correctly points out, and Defendants concede, Franklin was the only tenant out of the original fifteen SCIP tenants who continuously occupied the property and fully complied with the lease. Therefore, Defendants' concern that a finding in favor of Franklin would "open[] the door" to further claims does not appear to be a legitimate governmental interest.

The undersigned agrees that, in the abstract, Defendants' stated policy of refusing to sell property that benefits low-income families without some evidence of a properly executed contract is a legitimate government interest.  Defendants' position might clear the low hurdle of rational basis review if it were not for the unique facts Defendants themselves have created. Defendants themselves have produced documentary evidence that they promised SCIP I tenants the right to purchase their homes: (1) in the initial SCIP I solicitations to potential tenants; (2) in a letter to the Austin City Council; (3) in a letter to the SCIP I tenants; and (4) in the Lease Addendum itself.  City officials passed out the Lease Addendum, already signed by Defendants' representative, at a meeting in 1998.  Thus, the City itself created a self-executing contract establishing a future option to purchase.  (*See supra,* Section IV.A).

To the extent Defendants have a rational basis for requiring "documentation" from a person seeking to exercise the option, Defendants themselves have made no reasonable effort to keep track of the documentation of this contract that the City collected from the beneficiaries. *See Simi Inc. Co., Inc.*, 236 F.3d at 251 (governmental interest in protecting park was insufficient where county failed to provide documentation establishing existence of park).  Defendants admit the entire tenant files for the relevant time period are missing.  It is not rational for a government entity to hold a private citizen to a higher record-keeping standard than it observes in its own dealings.  Moreover, Defendants have admitted that Franklin is in fact an original tenant of SCIP I who received one of the self-executing Lease Addendum option agreements.  Therefore, as applied to Franklin, the City has articulated no rational basis for failing to honor the property right created by option contract and vested by Franklin's exercise of the option.  *See Conroe Creosoting Co. v. Montgomery Cnty., Tex.*, 249 F.3d 337, 341–42 (5th Cir. 2001) (if

governmental deprivation of property "shocks the conscience," plaintiff has stated substantive due process claim).

## V.   CONCLUSION

In sum, the undersigned finds Franklin had a vested, constitutionally protected property right in the option to purchase the residence.   She properly complied with all conditions precedent to trigger the option to purchase, and within 180 days of March 31, 2009, Defendants were required to deliver the Escrow Contract.   Defendants frustrated Franklin's attempt to exercise the option to purchase by failing to timely deliver the Escrow Contract.   Upon Franklin's query in April 2013, Defendants, without any prior notice or a hearing, denied that Franklin had an option to purchase in violation of her procedural due process rights. Accordingly, summary judgment on Franklin's procedural due process should be granted in favor of Franklin.   Defendants' proffered reason for the denial, as applied to Franklin's particular circumstances, is arbitrary and capricious, and therefore summary judgment on Franklin's substantive due process claim should be granted in favor of Franklin.

Because Franklin had a vested property right which was taken from her without due process of law, the District Court should grant her request for declaratory judgment that Defendants arbitrarily and capriciously deprived her of her property without due process of law, and order Defendants to deliver the Escrow Contract and otherwise comply with the terms of the Lease Addendum incorporated into her lease.

## VI.   RECOMMENDATION

The undersigned therefore **RECOMMENDS** that the District Court **DISMISS WITHOUT PREJUDICE** the claims against Defendant Copic in her individual capacity.

The undersigned further **RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Summary Judgment (Clerk's Dkt. No. 18).

The undersigned **FURTHER RECOMMENDS** that the District Court **DECLARE** that Defendants arbitrarily and capriciously deprived Franklin of her property interest without due process of law.

The undersigned **FURTHER RECOMMENDS** that the District Court **ORDER** Defendants to comply with the terms of the Lease Addendum incorporated into Franklin's lease, including but not limited to delivery of the Escrow Agreement to Plaintiff within thirty (30) days of the entry of the District Court's Order on this Report and Recommendation.

The undersigned **FINALLY RECOMMENDS** that the District Court **DENY** Defendants' Motion for Summary Judgment (Clerk's Dkt. No. 20).

## VII.   OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**SIGNED** on April 3, 2015.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE